# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

```
                                                   FILED
                                   2023 JUN -8  PM 1:04
                                   CLERK US DISTRICT COURT
                                   MIDDLE DISTRICT FLORIDA
                                   ORLANDO, FL
```

_____/

ALLEN B. GOTTLIEB, Pro Se

PHYLLIS J. GOTTLIEB, Pro Se, Individually         CASE #

   and as Guardian of Jesse H. Gottlieb,         COMPLAINT

               Plaintiffs,         DECLARATORY JUDGMENT

Vs.                                               DAMAGES

SECURITIES AND EXCHANGE COMMISSION.               DEMAND FOR JURY TRIAL

         Defendant.

_____/

Allen B. Gottlieb, pro se          Phyllis J. Gottlieb, pro se, individually and
                                   as Guardian for Jesse H. Gottlieb

                                   9246 Edenshire Circle, Orlando Fla.32836

                                   Lawconsultancy@aol.com, 786-557-3717

## CITATIONS

94-cv-3034 (LAP), DSNY

Lui v. SEC No, 18-1501,2019 WL 5659111 *U.S. Nov, 2019)

Kokesh vs SEC, 137 S Ct 1635 (2017).

Erie R. Co. v. Tompkins, 304 U.S. 64,78 (1938),

Snyder v. Davis, 699 So.2d 999, 1002 (Fla., 1997),

Lopez, 531 So.2d 946, 948 (Fla. 1988),

Butterworth v. Caggiano, 605 So.2d 56 (Fla. 1992);

Hubert v. Hubert, 622 So.2d 1049 (Fla. 4th DCA 1993);

Moore v. Rote, 552 So.2d 1150 (Fla. 3d DCA 1989);

In re Estate of Skuro, 467 So.2d 1098 (Fla. 4th DCA 1985), 487 So.2d 1065 (Fla.1986).

Tramel v. Stewart, 697 So.2d 821 (1997),

Dunphe, 143 Fla. 603, 197 So. 328 (1940),

Brown v. Connecticut General Life Ins. Co., 934 F.2d 1193, 1197 (1 l th Cir. 1991).

Soler v. Indymac Mortgage Services, 2015 WL 3952620 at *2 (S.D. Fla. June 29, 2015),

Jumara v. State Farm Ins. co., 55 F.3d 873, 878 (3d Cir. 1995);

17A Moore's Federal Practice, S 1 1 1.02,

Matthew Bender 3d ed.2006).

Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S.Ct. 805, 1 1 L.Ed.2d 945 (1964)

Ferens, 494 U.S. at 527-28, 110 S.Ct. 1274,

Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995),

IA PT. 2 MOORE'S p 0.345;

Shutte v. Armco Steel corp., 431 F.2d 22 (3d Cir. 1970), 401 U.S. 910, 91 S.Ct. 871 (1971).

IA PT. 2 MOORE'S p 0.345 at 4360;

15 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION, Sec. 3848, at 385 (2d ed. 1986);

1

*[Schexniderv. McDermott Int'l, Inc., 817 F.2d 1 159 (5th Cir. 1987);*

*Miracle Stretch Underwear Corp. v. Alba Hosiery Mills, Inc., 136 F. Supp. 508 (D.Del.1955)],*

*IA PT. 2 MOORE'S p 0.345, at 4363,*

*15 WRIGHT, MILLER & COOPER Sec. 3848, at 385; id. Sec. 3848; Sec. 3849, at 408; Sec. 3851 at 420-22; Sec. 3853,*

*IA PT. 2 MOORE'S p 0.345, at 4363; the defendant's preference, 15 WRIGHT, MILLER & COOPER Sec. 3848, at 385id. Sec. 3848; Sec. 3849, at 408 id. Sec. 3851, at 420-22; Sec. 3853,*

*IA PT. 2 MOORE'S p 0.345, at 4367; at 4373; 15*

*WRIGHT, MILLER & COOPER Sec. 3854;*

*IA PT. 2 MOORE'S p 0.345, at 4374; 15 WRIGHT, MILLER & COOPER Sec. 3854,*

*IA PT. 2 MOORE'S p 0.345, at 4367; at 4373;*

*15 WRIGHT, MILLER & COOPER Sec. 3854;*

*IA PT. 2 MOORE'S p 0.345, at 4374;*

*15 WRIGHT, MILLER & COOPER Sec. 3854,*

*Hoffman v. Blaski, 363 U.S. 335, 342,*

*Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055,*

*Ex pane Collett, 337 U.S. 55, 71, 69 S.Ct. 944, 946, 93 L.Ed. 1207,*

*Ex parte Collett, 337 U.S. at page 58, 69 S.Ct. at page 946,*

*United States v. National City Lines, Inc., 337 U.S. 78, 84, 69 S.Ct. 955, 958, 93 L.Ed. 1226. Like the Seventh Circuit, 260 F.2d at page 322,*

*McLaughlin in Paramount Pictures, Inc. v. Rodney, 3 Cir., 186 F.2d 1 11, 119,*

*Commercial Casualty Ins. Co. v. Consolidated Stone co., 278 U.S. 177, 179—180, 49 S.Ct. 98, 99, 73 L.Ed. 252;*

*Neirbo co. v. Bethlehem Shipbuilding corp., Ltd., 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167.)*

*Lincoln Sq. Synagogue, Inc. v. Lexington Strategies, LLC,* 2020 N.Y. Slip Op. 32793(U) (Sup. Ct., N.Y. County Aug. 26, 2020)

*Jackson v. Bank of Am., N.A.*, 149 A.D.3d 815, 818 (2d Dept. 2017).

2

*Weinstein v. Gitters*, 119 Misc. 2d 122, 123 (Sup. Ct., Suffolk County 1983).

*Chemical Bank v. Flaherty*, 121 Misc. 2d 509, 510 (Civ. Ct., Queens County 1983)),

*Chemical Bank,* 121 Misc. 2d at 510.

*Matter of Kitson & Kitson v. City of Yonkers*, 40 A.D.3d 758 (2d Dept. 2007) *Friedman v. Mayerhoff*, 156 Misc. 2d 295, 296 (Civ. Ct., Kings County 1992)

*Weinstein*, 119 Misc. 2d at 123-124

*Chemical Bank,* 121 Misc. 2d at 511;

*Lincoln Fin. Servs., Inc. v. Miceli*, 17 Misc. 3d 1109 (A), 2007 N.Y. Slip Op. 51893 (U) (Dist. Ct., Nassau County 2007)

*Demayo vs. Chames, So. 2d, 207 WL 4440212 (Fla)*

*Sunbank Miami V. Papadopolous, 740 So. 2d 594 (Fla. 3d DCA 1999),*

*In Re Edwards 456 B.SR. 807*

*(Bankr. M.D. Fla. 2006)*

*Staten Island Savings bank v. Rich Associates Inc. 6 Fla. L. Weekly Supp. (17th Judicial Circuit 1999),*

*In re: Lee, 223 B.R. 595*

*(Bankr.M.D. Fla. 1998),*

*Florida Constitution 2004 Art. X, Sec. 4(a)(1),*

*Carter's Afm'rs v. Carter, 20 Florida. 558 (1994,*

*Sherbill v. Miller Mfg. co. 89 So 2d 28, 31 (Fla. 1956),*

*McKean V. Warburton, 919 So. 2d 341, 334 (Fla. 2005),*

*Public Health Trust v. Lopez, 531 So. 2d 946, 948 (Fla 1988),*

*Snyder, 699 So. 2d at 1002,*

*Tramel v. Steward 697 So. 2d 821 (Fla 1997),*

*Rossano v. Britesmile, Inc. 3rd DCA (12.28.2008),*

*Beal Bank SSB v. Almand Associates 780 So. 2d 45 (Fla. 2001),*

*Bowers v Mozingo 399 So. 2d 492 (Fla. 3d DCA 1981).*

*Quigley v. Kennedy and Ely Insurance, Inc., 207 So. 2d 431 (Fla 1968)*

15-893 CV (2D Cir. February 11, 2012**)**

*Cont'l Dev. Corp. v. Duval Title & Abstract Co., 356 So. 2d 925, 927 (Fla. 2d DCA 1978)*

*Gates v. Utsey, 177 So.2d 486 (Fla. 1st DCA 1965);*

*50 Am.Jur.2d Libel and Slander Sections 541 and 546 (1970)).*

*Sailboat Key, Inc. v. Gardner, 378 So. 2d 47, 48 (Fla. 3d DCA 1979).*

*Nautica Int'l. v. Intermarine USA, L.P.,* 5 F. Supp. 2d 1333, 1344 (S.D.Fla. 1998);

*Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,* 742 So. 2d 381, 385 (Fla. 4th DCA 1999).

*Kiepfer v. Beller,* 944 F.2d *1213, 1220 (5th Cir.1991).*

*In re Burzynski, 989 F.2d 733, 739 (5th Cir.1993).*

*Personal Preference Video, Inc. v. Home Box Office, Inc., 986 F.2d 110, 111 (5th Cir.1993)*
*Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 939 (Tex.1991).*

*Bothmann v. Harrington*, 458 So. 2d 1163, 1168,1170 (Fla. 3d DCA 1984).

*Miceli v. Gilmac Developers, Inc.*, 467 So. 2d 404, 406 (Fla. 2d DCA 1985).

*Phillips v. Epic Aviation, LLC*, 234 F. Supp. 3d 1174, 1211 (M.D. Fla. 2017).

## STATUTES

*28 U.S.C. 2462*

*28, U.S.C. 1404 (a)*

New York CPLR 5222(a) (d) (e)

Florida Constitution and Homestead Statutes

Section 20(d) of the Securities Act of 1933, 15 U.S.C. sect. 77t(d*)*

## **EXHIBITS**

| AAA. | Index of Real Estate Owned 1986 – 2015 | 15 |
|------|----------------------------------------|----|
| AA. | Stipulation and Order of Settlement | 10 |
| B. | Affidavit of Neil Milestone, Esq. | 17 |
| C. | 11Th Circuit Complaint – Miami-Dade Florida | 18 |
| C-1. | Driver License, Voter I.D., Firearms License | 20 |
| C-1-1 | Garnishee Restraining Notice | 20 |
| D. | Opposition Motion to Transfer | 18 |
| D-1 | Prevent Depletion of Funds | 24 |
| D-2. | Rule 3.01 Application to dismiss. | 25 |
| E. | Expert Witness Affidavit – Ramon Sousa | 28 |
| F. | Federal Reserve position on MTNs | 29 |
| G. | Bell Boyd & Lloyd – Legal Opinion | 29 |
| H. | Bank Santander Standby - Trading Program | 29 |
| I. | FBI Affidavit – Sup. Special Agent Gerald Forrester | 30 |
| J. | Attorney Barday – Discounted Buy Contract | 31 |
| K. | Letter to Hon Judge Preska | 31 |
| K-1. | 98-cv-2636 (LAP) – Judgment | 32 |
| K-2. | 2nd Circuit Appeal 15-893 CV (2D Cir. Feb. 11 2016) | 32 |
| L. | NYS Grievance Committed - Sam Abady, Esq. | 34 |
| M. | Purchase Contract for Phyllis's Bahamas Home | 35 |

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF FLORIDA

_____/

| | |
|---|---|
| ALLEN B. GOTTLIEB, Pro Se | |
| PHYLLIS J. GOTTLIEB, Pro Se, Individually | CASE # |
| and as Guardian of Jesse H. Gottlieb, | COMPLAINT |
| Plaintiffs, | DECLARATORY JUDGMENT |
| Vs. | DAMAGES |
| SECURITIES AND EXCHANGE COMMISSION. | DEMAND FOR JURY TRIAL |
| Defendant. | |

_____/

### COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES

Plaintiffs, Allen B. Gottlieb, pro se, 82 years of age, (hereinafter "Allen") Phyllis J. Gottlieb, pro se, 73 years of age (hereinafter "Phyllis") individually and as Miami-Dade Probate Court Appointed Guardian for their son Jesse H. Gottlieb (hereinafter "Jesse") 30 years of age, who was born with profound complications of Down Syndrome and live at home with his parents (hereinafter "Gottlieb family").

We, therefore, respectfully request this Honorable Court issue a Declaratory Judgment to restrain nullify the SEC's restraining order and for the immediate return of Phyllis's Florida protected $817,000 Homestead proceeds (hereinafter "Homestead Proceeds") unlawfully restrained since 2015 which resulting in the Gottlieb family being suddenly tossed into the streets of Homelessness and kept there for 8+ years, 3000 days.  This heinous event was as a direct result of the SEC's willful and malicious slandering Phyllis's title to her Aventura, Lakes Florida Homestead residence by ignoring the exculpatory evidence in the record and ignoring the controlling Florida Constitution, Homestead statutes and well-litigated common law rulings which prove Phyllis was the sole owner of her Florida Homestead when it was sold in 215.

6

Additionally, the SEC has failed to provide a single credible document to support any of their meritless claim such as alter ego and related case theory and has failed to by meet the critical requirements to overcome the powerful Florida Homestead protections against creditors and predators plus failing to meet the critical requirements of New York 5222(b), 28 U.S.C 1404(a) and 28 U.S.C. 1462.

We also respectfully request the Honorable Court permit us the opportunity to present our meritorious arguments to prove the 2003 Judgement in Case 98-cv-2636 (LAP) is void on the grounds that New York Court lacked Jurisdiction over Phyllis and over her Homestead Proceeds due to the litigating the same critical circumstance in case 94-cv-3034 (LAP), when Allen "disgorged" his lawfully earned legal fees of $350,000+ without a finding of ill-gotten gains. Upon which the Court ruled the case dismissed and settled with prejudice.  Therefore, case 98-cv-2636 (LAP) and the ensuing 2003 Judgment was barred by the Doctrines of Res Judicata, Double Jeopardy, Equitable Estoppel and Unclean Hands.

The Court showed extreme favoritism to the SEC and extraordinary prejudice to the Gottlieb family through the entire 8+ years and even to the day of infamy when the Court paid our Attorney, Eisemann $56,428 by depleting Phyllis's protected Homestead proceed over her vigorous objections in return for his agreement not to help any member of the Gottlieb family and thereafter refuse to file a single challenge, objection, or motion to defend for 5+years.

We respectfully request the Honorable Court issue a permanent injunction to prevent the SEC from continuing their harassment and malicious pattern of abuse of SEC privilege by slandering Phyllis's ownership title in Florida, but also in Nassau, Bahamas where the SEC has unlawfully repeated their same scheme of slandering Phyllis's Bahamian vacation home owned since 1997, by failing to provide a single credible document to prove their fraudulent and vicious claims of alter ego which caused the buyer to cancel his $960,000 purchase agreement.

We, therefore, respectfully request a protective order to prevent such other and further abuses of power by the Securities and Exchange Commission (hereinafter SEC) on the basis of granting them preferences which must end where our civil rights begin, and for such other relief

7

and damages including punitive relief as the Court so determines as fair and just against
Defendant, SEC, and in support thereof Plaintiffs states the following:

## JURISDICTION AND VENUE

1. The Honorable Court has jurisdiction under 28 U.S.C. 1331 of all Civil Actions.

2. The Honorable Court has jurisdiction under 28 U.S.C. 1391, in that the action accrued in
   the State of Florida, the Homestead was in the State of Florida and the Plaintiffs resided
   in the State of Florida at the time the action occurred and are currently residing in
   Orlando, Orange County in the State of Florida.

## PARTIES

3. Plaintiffs, Allen B. Gottlieb, Phyllis J. Gottlieb individually and as Court Appointed
   Guardian of Jesse H. Gottlieb, the "Gottlieb Family", residents of the State of Florida at
   all relevant times.

4. Defendant, the Securities and Exchange Commission (Agents to be determined), "SEC",
   Federal Agency and existing under the Securities and Exchange Act of 1934, with offices
   in the State of Florida.

## OVERVIEW HISTORY

5. The Gottlieb family provides the following in support of the relief requested:

   (1) In 1994, 9 years prior to the SEC's judgment, Allen was released from the hospital
       and diagnosed with an inoperable heart condition. He was told that his next attack
       could be his last day on earth. Allen then quit claimed his joint interest in two
       properties he and Phyllis owned as tenants by the entirety to Phyllis, making her the
       sole owner. All the documentary evidence in the record proves that Phyllis is the
       sole owner of her Aventura Homestead when it was sold in 2015 and the SEC has
       not opposed Phyllis's Homestead claim. However, the SEC served Phyllis in 2015 and
       had Phyllis's Homestead case and the proceeds, $817,000 unlawfully restrained
       after her case was transferred to New York. This abuse of power continues after 8+
       years without any relief in sight even though the SEC's judgment, an unsecured lien
       against Allen is feckless against Florida Homestead proceeds even if the Judgement

was against Phyllis, as the sole owner, owner as tenant by the entirety, or even if she was an alter ego, which she is not.

(2) The SEC has a judgment on Allen which is not against Phyllis, yet without a single credible document to support the SEC's fraudulent claim of Alter Ego and related case claims the Court has prejudicially treated Phyllis as the judgment debtor.

(3) The SEC's failure to provide a single credible document to overcome the Florida Homestead Statute on day one, but instead of dismissing the case the targeted assault continues after 8+ years to this very day.

(4) In good faith, Phyllis provided the SEC with a copy of Phyllis's retirement Homestead purchase agreement in Ocala, Florida which was conditioned solely upon the use of the Aventura Lakes Homestead proceeds.  Phyllis provided the SEC proof of being a Florida Homesteader with copies of Phyllis's and Allen's valid Florida Homestead voter identifications cards, Florida's valid driving licenses and Florida valid concealed weapon or firearm licenses. Phyllis also provided an enormous number of exculpatory title and ownership deeds all properly filed by licensed attorneys and notarized plus two legal opinions from highly respected Florida attorneys, Neil Milestone, Esq. and David Anderson, Esq. confirming Phyllis's sole homestead ownership and that Allen has zero ownership.  The SEC has failed to oppose any of these documents!

(3) The Federal-5-year statute of limitation on disgorgements expired about two decades ago.  The SEC is disingenuously attempting to obstruct justice and circumvent the law by fraudulently claiming Allen owns Phyllis's Homestead without a single credible document to support that fraudulent claim.  The SEC has failed to plead any of the exceptions to Homestead as such there are no circumstances under which the SEC can make a valid claim on the Homestead proceeds, yet the case continues and continues.

(4) The SEC's failure to provide a scintilla of credible evidence to support their meritless claims of alter ego and related cases to meet the critical requirements of 28 U.S.C. 1404(a) before disturbing Phyllis choice of Florida Venue.  However, Phyllis's case was transferred to New York anyway and remained in New York without New York

jurisdiction for 8+ years.  This catastrophe began when the Court "paid" Eisemann, our attorney, $56,428 from Phyllis's homestead proceeds over her objections in exchange for his quid-pro-quo promise not to interfere.  This followed with Eisemann's refusing to plead Phyllis's powerful Florida Homestead protections, instead he pleaded "tenants by the entirety".  Why? Because if he pleaded Homestead, then he would be unable to accept Homestead proceeds to pay legal fees. As a result Eisemann failed to file a single challenge, objection or motion for 5+ years, refusing to do his job and refusing to follow our instructions to motion for a change of venue back to Florida who has both subject matter and personal jurisdiction, is where the action occurred and where the documents and ALL the witnesses reside thus making New York subpoena power ineffective beyond 100 miles, plus the problem of traveling with a disabled child up and back to New York several times and the costs of expensive hotels and restaurants making it impossible for her to mount a defense with her money tied up.  The SEC has major resources in both New York and Florida and Phyllis has no connections to New York.  Eisemann was an excellent attorney before accepting the "payment" but afterwards he turned on us and tossed us under the bus where we have remained without legal representation ever since.  Eisemann now had to satisfy the Court and the SEC to collect his next paycheck.

**(EXHIBIT-AA…. Page 4, Article 13)**

(5) In 2015 the SEC's fraudulently and maliciously slandered Phyllis's Florida Homestead sole ownership despite the exculpatory evidence in the record proving she owns the property but without a single credible document to support that claim.  The New York Court granted the SEC a restraining order unlawfully causing Phyllis's Homestead proceeds dedicated to purchase another homestead in Ocala, Florida to be restrained and she lost that opportunity.  As a result, the Gottlieb family, with a profoundly disabled child were all suddenly tossed into the violence of devastating homelessness and eventual financial ruination.  The Court's punishment was ruthless and undeserved!  The Court has refused to release any money to Phyllis from her own Homestead proceeds and as a result were left without money to pay for rent, transportation, buy groceries and necessities, nor even pay for medical care. Yet the Court had no difficulty paying

$56,428 to our attorney, Eisemann, over Phyllis's vigorous objections.  In exchange for the "payment" Eisemann provided his quid-pro-quo promise not to help any member of the Gottlieb family.  The subliminal meaning of that undertaking ran far and deep because thereafter Eisemann refused to file a single challenge, objection, or motion for 5+ years we were without any legal representation and without due process protections offered guaranteed by the United States Constitution or the Florida Constitution.

(6) In 2019 the SEC's maliciously slandered Phyllis's sole ownership to her Nassau, Bahamian Home, once again without a single credible document to support that fraudulent claim.  The SEC attempted to obstruct justice and circumvent the statute of limitations which expired about two decades ago.  The SEC contacted the Buyer who had a contract to purchase Phyllis's home for $960,000 and attempted to enlist him in their illicit scheme to lull Phyllis into the closing then steal Phyllis's proceeds!  The SEC who already gathered the Title Documents showing Phyllis owned the property since 1997 and intentionally mislead the buyer into thinking that Allen owned the property.  The buyer's attorney already had completed his title search and was prepared to close in a week or so. The Buyer contacted Phyllis and me and complained that he loved the home but had to cancel the agreement because the SEC interfered and wanted him to be a Rat for them, but the buyer refused to be a participant in their plot.

(7)  These facts prove that the SEC willfully engaged in tortuous interference with Phyllis's $960,000 Bahamian Home sales contract and that such actions directly led to the purchase agreement to be cancelled.

(8) The SEC was barred from relitigation in 1998 based upon the earlier ruling in case 94-cv-3034 (LAP) on the same critical circumstances as in case 98-cv-2636 (LAP) because Allen "disgorged" $350,000+ dollars, all of his legally earned legal fees, without a finding of ill-gotten gains leaving Allen with nothing but a loss.  The Court ruled the case settled and dismissed with prejudice.  Therefore, the 2003 judgment is **void!**  Allen cannot be required to disgorge a second time that which was already disgorged and certainly Phyllis cannot be asked to disgorge a third time.  Thus, case 98-cv-2636 (LAP) lacked jurisdiction and was barred pursuant to the doctrines of res judicata, double jeopardy,

11

equitable estoppel, and/or unclean hand.  The New York Court denied me due process opportunity to provide these winning and meritorious arguments, which I now respectfully put before the Florida Court.

(9) On June 22, 2020, the Supreme Court in *Lui v. SEC* held that the SEC has statutory authority to seek disgorgement *so long as the amount of disgorgement does not exceed the defendant's net profits and is awarded for the victims.*  In 1995 Allen "disgorged" all his lawfully earned legal fees without a finding of ill-gotten gains in case 94-cv-3034 (LAP) and the Court ruled the case dismissed and settlement, with prejudice.  Therefore, in case 98-cv-2636 (LAP) the SEC was limited to a recovery of ZERO, but the Court erroneously awarded almost $3 Million dollars and the award was to be paid to the U.S. Treasury not to the victims.

(10)  *In Kokesh vs SEC, 137 S Ct 1635 (2017)* the Supreme Court issued its decision and held that claims by the SEC for disgorgement are subject to the 5-year statute of limitations set forth in 28 U.S.C. 2462. In case 98-cv-2636 (LAP)  the Court made an award to the SEC 22-months after the statute of limitations honestly expired by granting the SEC extensions to the statute based upon the SEC's bogus claim that Allen was a fugitive.  However, in discovery a letter appeared written from the SEC to Judge Preska that revealed the SEC knew were Allen lived and worked in the Bahamas for years but just forgot to serve him as such the case should have been dismissed.  Allen provided the information that the SEC was provided by the NYS Bar Association because to was provided by Allen when he accepted a position to work in the Bahamas.  Allen lived in the Florida and New York for over 5 years before moving to the Bahamas in 1997 and could have been served without any difficulty within the statutory limits. The Gerald Forrester the Supervisory Special Agent for the FBI in Charge of the Bahamas confirmed in an Amicus Curie Affidavit to the Court, they know Gottlieb and could have served him in 24 hours, instead of the 7 years the SEC pretended.  The SEC also provided the Court with a fraudulent translation of a Belgium Process server's Affidavit to trick the Court who should have dismissed the case when it was revealed!  Plus, a lot of other evidence proving that Allen and his family lived openly in the Bahamas the same as in Florida and

certainly was not a fugitive.   Therefore, when the SEC served Phyllis in 2015, 2-decades after the statute expired, the case was without jurisdiction!  Additionally, the SEC has a 2003 judgment against Allen which is not against Phyllis!  The SEC failed provide a single credible document to make a valid claim on Homestead proceeds and never attempted to oppose the protections provided by the Florida Constitution, Homestead statute and common law rulings which favor Phyllis on all relevant issues, nor oppose the two legal opinions.  Yet they proceeded to make the Fraudulent claims of alter ego and related cases anyway, just to harass and damage the Gottlieb family still after 8+ years not a single credible document to meet the critical requirements of New York CPLR 5222(b) <u>PRIOR</u> to restraining Phyllis's homestead proceeds.

(11) Phyllis's attorney was more than compromised when the Court and the SEC (Phyllis's adversary) agreed to settle the dispute between Phyllis and her attorney, without her consent and over Phyllis's vigorous objections they paid Eisemann $56,428.  The dispute resulted over Eisemann's refusal to follow our instructions to defend using the powerful Florida Constitution, Homestead statute and common law rulings, but instead Eisemann pleaded the less important defense, tenants by the entirety!  Why? Because if Eisemann pleaded Homestead he would be faced with the prohibitions against accepting $56,428 for legal fees from Homestead proceeds.  The Court, the SEC and Eisemann were all informed that legal fees cannot be paid from Homestead proceeds, but they all ignored the Homestead law and paid him $56,428 anyway.  In exchange for the "payment" Eisemann provided his quid-pro-quo agreement not to help any member of the Gottlieb Family.  Thereafter Eisemann failed to file a single challenge, objection, or motion for over 5+ years resulting in the Gottlieb family being thrown under the bus.  From the moment Eisemann grabbed the $56,428 we were denied legal representation.

(12)  As a direct consequence of the New York Court's extreme favoritism to the SEC and extraordinary prejudice to plaintiff's resulting in the loss of the Gottlieb family's Constitutional due process opportunity and equal protection, the right to effective counsel, the loss of their homestead for 8+ years and were financially ruined.

(13)  The SEC has a 2003 judgment against Allen, that judgment is not against Phyllis. They failed to meet the critical requirements of New York CPLR 5222(b) as such they failed to establishe New York jurisdiction over Florida Homestead real property failing to meet the critical restraining Notice requirements of 5222(b), fraudulently claiming Allen is the owner but failing to provide a single credible document to support their frivolous claim of alter ego, related case theory, same parties in both cases and same causes of action in both cases which are required but instead of dismissing Phyllis's transferred case on day one, it continued for **8+years, 3000** days and counting and the Gottlieb family continues to be violently subjected to the consequences of devastating homelessness with a profoundly disabled child.

(15) The Court's failure to make a simple ruling to return Phyllis's Homestead proceeds for 8+ years due exclusively to the New York Court declining to adjudicate Phyllis's Homestead case in her favor and returning her money so she could purchase her safe harbor home,  The Court obviously is punishing to Allen by transferring this undeserved punishment to his innocent family, intentionally ignoring the controlling Florida Constitution, Homestead Statute, and well-litigated common law rulings that resulted in homelessness and eventual financial ruination after 8+ terrifying years.

(15) The SEC's ultra vires abusive actions under color of law are well beyond the lawful use of SEC credentials, power, and authority perpetrated without a scintilla of credible evidence just to willfully inflict targeted draconian damage on the innocent Gottlieb family with a profoundly disabled child in both Florida and in Nassau, Bahamas must be prevented from unjustly harming my family.

6. <u>Summary:</u> Based upon the massive amount of unbridled favoritism to the SEC and extreme prejudice to Phyllis and the Gottlieb family, with a profoundly disabled child, including having their attorney compromised and unwilling to defend them for 5+ years the Court granted the SEC a restraining order which resulted in the Gottlieb family being tossed into the street and suddenly subjected to the violent and dangerous consequences of homelessness and kept there for 8+ years even though the SEC failed to provide a single credible document to overcome the enormous amount of exculpatory

evidence proving Phyllis was the sole owner of her Aventra Homestead when it was sold. This catastrophic abuse of power continues to this very day, without New York jurisdiction and without any indication of relief in sight as Phyllis's continues to be denied the use of her Homestead proceeds while we remain homeless.  We are seeking no more than adjudication of the law, justice and equity by filing this Complaint in the Florida Court who has subject matter and personal jurisdiction, Florida is where the Action occurred, and Florida is where all the Documents are located, and Florida is where ALL the witnesses reside.

<u>UNDIPUTED FACTS THAT SUPPORT RELIEF</u>

7.   In 1994 Allen was rushed to the hospital with an uncontrolled heart arrhythmia.  Upon his release Allen was told he had an inoperable heart abnormality, and that the next episode might be Allen's last day on earth. Allen was married 20 years and Phyllis had given birth to Jesse with Down Syndrome and was in her last months of pregnancy with their daughter, Rachel.  Allen contacted their attorney and was advised the best way to avoid the expense and confusion of probate in case of death was to quit claim the two properties they already owned as tenants by the entirety, one in Key West, Florida and one in Fort Lauderdale, Florida.  Allen followed their attorney's instruction and quit claimed is joint interest to Phyllis. Thereafter Phyllis was the sole owner of both properties. Obviously, there for no reason for Allen to accumulate any wealth thereafter.

8.   **INDEX OF ALL REAL PROPERTY EXHIBITS**.  All Florida real estate deeds beginning in 1986 show Allen and Phyllis Gottlieb as owners as tenants by the Entirety.  Beginning in 1994 when Allen quit claimed his interest to this wife of then 20 years, thereafter, Phyllis became the Sole Owner of all Gottlieb Family real estate Homesteads thereafter.

9.   To be noted the properties were already protected from creditors and predators being owned as tenants by the entirety and Allen had no creditors at that time, never heard the name SEC anywhere, and the quit claims occurred 9 years prior to the 2003 judgment in case 98-cv-2636 (LAP) which I object to as void without jurisdiction and

barred by doctrines of res judicata, double jeopardy, equitable estoppel and/or unclean hands.

10. In Case 94-cv-3034 (LAP) Hon. Judge Preska and Allen had open court up-and-back when the Court refused to release any money so that Allen could pay his secretary, rent, buy groceries, or medical care for Jesse.  When Allen objected the Hon. Judge stated that *she is "GOD" in her Courtroom*. Allen responded to the blasphemy with words to the effect that *you are not GOD anywhere.* Allen was told that if he continued, he would be held in contempt.  Allen and his law partner, Retired Lieutenant Colonel James Reed, former undersecretary of the United States Department of Treasury left the Court.

11. In Case 94-cv-3034 (LAP) on August 1, 1995, the Court issued their stipulation and order and all claims and counterclaims were dismissed.  Allen "Disgorged" $350,000+ in lawfully earned legal fees without a finding of ill-gotten gains and the case was ordered Dismissed and Settled with Prejudice. **(EXHIBIT A)**

12. Hon. Judge Preska has never forgotten Allen's remark, *you are not GOD anywhere*, and the opportunity and desire for revenge.  Allen has been the target of an extraordinary level of prejudice in case 98-cv-2636 (LAP) and several related cases including three Rule 60 filings loaded with exculpatory evidence to prove that Allen lacked even a trace of scienter and that bank guarantees, medium term notes, standby letters of credit and other forms of bank guarantees are traded in the billions daily.

13. As a result, Allen was denied due process opportunity to be heard on his meritorious arguments in Case 98-cv-2636 (LAP) including but not limited the bar against relitigating the same critical circumstances that were barred by the Doctrines of res judicata, double jeopardy, equitable estoppel and/or clean hands.  No matter where Allen filed his new complaints, in New York or in Florida, in all instances they were transferred back to Hon Judge Preska and summarily dismissed without even a hearing.

14. On July 20th, 2015, Phyllis Gottlieb, the wife of Allen Gottlieb, as sole owner of her primary homestead located at 3234 NE 211th Terrace, Aventura Lakes, Florida 33180, hereinafter referred to as "Homestead" for $945,000, netting $817,000 after paying real estate commission, real estate taxes and Homeowner Fees, etc.

16

15. On July 27th, 2015, the SEC filed a restraining notice, "notice" to the escrow agent, First American, forbidding them to make any distribution of the Homestead proceeds or suffer the consequences. We believe that notice failed to meet the requirement of 5222(b) as letter explained in detail.

16. In Case 98-cv-2636 (LAP) the SEC maliciously and fraudulently alleged that Allen B. Gottlieb, a 2003 judgment debtor, which judgment is not against Phyllis Gottlieb, claimed to the Florida Court, to First American Title Insurance Company the stakeholder of Phyllis's Homestead proceeds, and afterwards to the New York Court that Allen was the actual owner of Phyllis's Florida Homestead, and further maliciously and fraudulently represented that Phyllis was an alter ego, and that Allen cases is (mysteriously) related to Phyllis's case. However, the SEC failed to provide a single meritorious document to support their fraudulent claims of New York Jurisdiction, alter ego and related case theory. Instead of dismissing the case on day one the case continued for 8+ years while the judge, with extreme favoritism to the SEC and extraordinary prejudice to Phyllis refused to make a simple ruling to return Phyllis's Homestead proceeds.

17. Mrs. Gottlieb is not, and has never been, a party, or even a witness to either 1994-cv-3034 (LAP) or the 1998-cv-2636 (LAP) case.

18. Mrs. Gottlieb files her taxes separately from her husband and filed her Homestead Exemption in 2015, prior to selling her Aventura Homestead.

19. Mrs. Gottlieb is the sole owner of the family Homestead residence and Allen has never possessed any ownership interest in the property. This is supported by an enormous amount of exculpatory deeds of ownership properly filed in county registries by licensed attorneys and notarized, plus two unopposed legal opinions from two highly respected Florida attorneys, Mr. Neil Milestone, Esq. **(EXHIBIT B)** and Mr. David Anderson, Esq., both confirming that Phyllis was the sole owner of her Homestead when it was sold, and that Allen has zero interest in the Homestead.

20. Prior to the sale of the property, the Internal Revenue Service. "IRS", coincidently placed a lien on Phyllis's Homestead and took $25,900 from her bank account while Phyllis was

being operated on for a hip replacement and only discovered this lack of funds when the hospital cut short her rehabilitation due to her credit card being denied. The IRS subsequently concluded that they made an error as a result of identity theft and then issued an apology and released the lien, but to this day the IRS never returned Phyllis's $25,900. We retained an IRS advocate Fred Perdomo who met with the IRS agent in Miami office and was told straight out that Phyllis would never get back the money!

21. I thought this entire affair was very suspicious and I filed a FOIA request with the IRS and the SEC. The IRS responded by confirming they had 4 telephone conversations with the SEC, but the SEC has refused to provide any information to this day on the number of calls they made to the IRS.

22. The Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida 15-cv-23309-RNS, then granted the SEC's motion to transfer Phyllis's Florida Homestead case together with her $817,000 Homestead Proceeds to New York Federal District Court even though the SEC failed to meet the spirit and critical requirements of 28 U.S.C. 1404(a) to disturb Phyllis's choice of Florida venue.

23. The transfer was extremely prejudicial to Phyllis and the Gottlieb family because it was strictly done as an accommodation and the SEC's heavy lobbying even though the SEC failed to provide a single credible document to support critical requirements to disturb Phyllis's choice of Florida venue nor, nor provide a lawful reason to transfer the Florida Homestead case to New York nor overcome the exculpatory evidence in the record proving Phyllis is the sole owner of her Aventura Homestead when it was sold, but despite all the relative law furnished to the Court the case was transferred anyway.

24. Phyllis's Florida attorney Mr. David Anderson Esq, original filing in the Circuit Court of the 11th Circuit in and for Miami Dade County, Florida. **(EXHIBIT C).**

25. Mr. David Anderson, Esq. provided his Complaint and Memorandum of Law in the United States District Court, Southern District of Florida, Miami Division, Case # 15-cv-23309 (Scola/Otazo-Reyes) which we incorporate into our Complaint because the Florida Constitution, Homestead statute and well-litigated common law rulings and arguments are not only relevant but continue to be controlling in this action. **(EXHIBIT D)** Citations

in support of Florida Venue, Florida Jurisdiction and Homestead: *Erie R. Co. v. Tompkins, 304 U.S. 64,78 (1938), Snyder v. Davis, 699 So.2d 999, 1002 (Fla., 1997), Lopez, 531 So.2d 946, 948 (Fla. 1988), Butterworth v. Caggiano, 605 So.2d 56 (Fla. 1992); Hubert v. Hubert, 622 So.2d 1049 (Fla. 4th DCA 1993); Moore v. Rote, 552 So.2d 1150 (Fla. 3d DCA 1989); In re Estate of Skuro, 467 So.2d 1098 (Fla. 4th DCA 1985), approved, 487 So.2d 1065 (Fla.1986). Tramel v. Stewart, 697 So.2d 821 (1997), Dunphe, 143 Fla. 603, 197 So. 328 (1940), Brown v. Connecticut General Life Ins. Co., 934 F.2d 1193, 1197 (1 I^th Cir. 1991). Soler v. Indymac Mortgage Services, 2015 WL 3952620 at \*2 (S.D. Fla. June 29, 2015), Jumara v. State Farm Ins. co., 55 F.3d 873, 878 (3d Cir. 1995); 17A Moore's Federal Practice, S 1 1 1.02, Matthew Bender 3d ed.2006). Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S.Ct. 805, 1 1 L.Ed.2d 945 (1964) Ferens, 494 U.S. at 527-28, 110 S.Ct. 1274, Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995), IA PT. 2 MOORE'S p 0.345; Shutte v. Armco Steel corp., 431 F.2d 22 (3d Cir. 1970), 401 U.S. 910, 91 S.Ct. 871 (1971). IA PT. 2 MOORE'S p 0.345 at 4360; 15 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION, Sec. 3848, at 385 (2d ed. 1986); [Schexniderv. McDermott Int'l, Inc., 817 F.2d 1 159 (5th Cir. 1987); Miracle Stretch Underwear Corp. v. Alba Hosiery Mills, Inc., 136 F. Supp. 508 (D.Del.1955)], IA PT. 2 MOORE'S p 0.345, at 4363, 15 WRIGHT, MILLER & COOPER Sec. 3848, at 385; id. Sec. 3848; Sec. 3849, at 408; Sec. 3851 at 420-22; Sec. 3853, IA PT. 2 MOORE'S p 0.345, at 4363; the defendant's preference, 15 WRIGHT, MILLER & COOPER Sec. 3848, at 385id. Sec. 3848; Sec. 3849, at 408 id. Sec. 3851, at 420-22; Sec. 3853, IA PT. 2 MOORE'S p 0.345, at 4367; at 4373; 15 WRIGHT, MILLER & COOPER Sec. 3854; IA PT. 2 MOORE'S p 0.345, at 4374; 15 WRIGHT, MILLER & COOPER Sec. 3854, IA PT. 2 MOORE'S p 0.345, at 4367; at 4373; 15 WRIGHT, MILLER & COOPER Sec. 3854; IA PT. 2 MOORE'S p 0.345, at 4374; 15 WRIGHT, MILLER & COOPER Sec. 3854, Hoffman v. Blaski, 363 U.S. 335, 342, Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055,*

*Ex pane Collett, 337 U.S. 55, 71, 69 S.Ct. 944, 946, 93 L.Ed. 1207, Ex parte Collett, 337 U.S. at page 58, 69 S.Ct. at page 946, United States v. National City Lines, Inc., 337 U.S. 78, 84, 69 S.Ct. 955, 958, 93 L.Ed. 1226. Like the Seventh Circuit, 260 F.2d at page 322, McLaughlin in Paramount Pictures, Inc. v. Rodney, 3 Cir., 186 F.2d 1 11, 119, Commercial Casualty Ins. Co. v. Consolidated Stone co., 278 U.S. 177, 179—180, 49 S.Ct. 98, 99, 73 L.Ed. 252; Neirbo co. v. Bethlehem Shipbuilding corp., Ltd., 308 U.S. 165, 60 S.Ct. 153, 84 L.Ed. 167.)*

26. The 2003 Judgement is against Allen, that judgment is not against Phyllis Gottlieb!

27. The SEC were provided proof of Allen and Phyllis being lawful homesteaders and provided copies of their valid voter identification cards, valid driver's licenses and valid concealed weapon licenses. **(EXHIBIT C-1)**

28. The SEC failed to provide a single credible document to prove Allen is the owner of Phyllis Homestead property, nor did they bother to overcome the enormity of exculpatory evidence in the record proving Phyllis is the sole owner of her Aventura Homestead when it was sold, nor have they opposed Homestead. Therefore, without FIRST meeting the critical requirement of New York CPLR 5222(b), the SEC maliciously and fraudulently targeted 3rd person (Phyllis's Proceeds without a single credible document to support that claim, nor the claims of alter ego and related cases, thus failed to follow the letter of the <u>Notice provision of 5222(b)</u> by speculation.  The SEC failed to establish New York Jurisdiction over Phyllis or over Phyllis's Homestead proceeds prior to restraining her Homestead proceeds which should have remained beyond the reach of the New York Court.  **(EXHIBIT C-1-1)**

29. Additionally, the SEC knew or should have known that under the powerful Florida Homestead statute it would not matter if Phyllis was the sole owner, owner as tenant by the entirety, or even an alter ego, because the Homestead would protect Allen even if he owned the Homestead.  Therefore, the SEC filed this their action recklessly under fraudulent pretenses just to harm, damage and harass the Gottlieb family!

30. In *Lincoln Sq. Synagogue, Inc. v. Lexington Strategies, LLC*, 2020 N.Y. Slip Op. 32793(U) (Sup. Ct., N.Y. County Aug. 26, 2020), the Court dismissed a turnover proceeding against

a garnishee because the judgment creditor failed to follow the notice provisions set forth in CPLR §§ 5222 (d) and (e).

31. Article 52 of the Civil Practice Law and Rules provides the enforcement mechanisms that judgment creditors, such as the petitioner in *Lincoln Square*, use to collect on a money judgment. *Jackson v. Bank of Am., N.A.*, 149 A.D.3d 815, 818 (2d Dept. 2017). These mechanisms include, among other things, the imposition of a restraining notice against a judgment debtor or a third-party garnishee. *Id.*

32. CPLR § 5225 allows a judgment creditor to initiate a special proceeding directing a person in possession of money or property in which the judgment debtor has an interest to turn the money or property over to the judgment creditor. CPLR § 5227 allows a judgment creditor to commence a special proceeding "against any person who it is shown is or will become indebted to the judgment debtor."

33. CPLR § 5222 provides the procedures for serving a restraining notice on the judgment debtor and a third-party garnishee. That statute requires the service of a copy of the restraining notice and a Notice to Judgment Debtor within four days of the service of the restraining notice if not already served within one year prior to the service of the restraining notice. CPLR §§ 5222 (d) and (e). *See also Weinstein v. Gitters*, 119 Misc. 2d 122, 123 (Sup. Ct., Suffolk County 1983). The Notice to Judgment Debtor is "designed to inform the judgment debtor, if he be a natural person, that certain monies are exempt from application to the satisfaction of the judgment" (*Chemical Bank v. Flaherty*, 121 Misc. 2d 509, 510 (Civ. Ct., Queens County 1983)), and sets forth the availability of procedures for asserting exemptions (CPLR § 5222). The judgment creditor has the burden of proving compliance with the statute. *Chemical Bank*, 121 Misc. 2d at 510.

34. When a restraining notice is served on a third-party garnishee, as in *Lincoln Square*, the turnover proceeding may not be maintained if the judgment creditor fails to comply with CPLR §§ 5222 (d) and (e) (*i.e.*, the provisions requiring notice to the judgment debtor about that restraining notice). *Matter of Kitson & Kitson v. City of Yonkers*, 40

A.D.3d 758 (2d Dept. 2007) (failure to serve a notice as required by CPLR 5222 § (d) on the judgment debtor rendered execution ineffective); *Friedman v. Mayerhoff*, 156 Misc. 2d 295, 296 (Civ. Ct., Kings County 1992) (failure to comply with CPLR § 5222 notice to debtor resulted in vacatur of the restraining notice); *Weinstein*, 119 Misc. 2d at 123-124 (restraining notice dismissed without prejudice for failure to serve judgment debtor in accordance with CPLR § 5222); *Chemical Bank*, 121 Misc. 2d at 511; *Lincoln Fin. Servs., Inc. v. Miceli*, 17 Misc. 3d 1109 (A), 2007 N.Y. Slip Op. 51893 (U) (Dist. Ct., Nassau County 2007) (vacating restraining order).

35. In *Lincoln Square*, the Court found "no proof" in the Restraining Notice and the amended petition, or any assertion that petitioner complied with CPLR §§ 5222 (d) or (e) with respect to providing notice to the judgment debtor. Slip Op. at *2-*3. Instead of such proof, said the Court, petitioner merely submitted a copy of the Restraining Notice it served on Lexington Strategies, LLC, the third-party garnishee. *Id.* at *3.

36. Accordingly, the Court dismissed the petition for failure to comply with the notice requirement of CPLR 5222 §§ (d) and (e).

37. Takeaway: The SEC failed to meet a letter of the law and the deadline or otherwise act in a timely manner, there are ramifications for failing to comply with deadlines and other requirements. *Lincoln Square* highlights the ramifications of failing to comply with statutory requirements.

38. "The restraining notice is designed to prevent a garnishee or other person from disposing of the judgment debtor's property pending a levy by the Sheriff or court order." *Chemical Bank*, 121 Misc. 2d at 510. When a judgment creditor serves a restraining notice on a third-party garnishee, a proceeding to enforce the judgment under § CPLR 5227 against the third-party garnishee may not be maintained if the judgment creditor does not comply with CPLR § 5222 (d). When that happens, as in *Lincoln Square*, the proceeding must be dismissed.

39. As one would expect, the burden is on the judgment creditor to plead and prove compliance with CPLR §§ 5222 (d) and (e). "To hold otherwise would serve to emasculate the protection afforded to judgment debtors by the CPLR 5222 (subd [e]) notice." *Id.* at 510-511.

40. One other point needs to be made about *Lincoln Square* and CPLR §§ 5222 (d) and (e). The notice requirement reflects "a legislative attempt to comply with constitutional due process requirements vis-à-vis the enforcement of judgments." *Friedman*, 156 Misc. 2d at 298 (citations omitted). "Thus, the failure to meet these notice requirements, that is to advise a judgment debtor that his property may be exempt from application to a judgment, involves a fundamental due process right to which the presence or absence of prejudice would seem to be irrelevant." *Id.* For this reason, "the failure to comply with CPLR 5222 and 5232 necessitates vacating [a] restraining notice and/or execution" upon a third-party garnishee possessing assets or property of a judgment debtor.

41. The SEC failed to provide a scintilla of credible evidence to support the critical requirements of 5222(b) when they filed their wildly fraudulent claim of alter ego, same parties in both cases, same causes of action to be a related case. The two cases are not related because Allen's New York 1998 securities case has no relationship to Phyllis's Florida 2015 Homestead real property case which was even further separated by over 1,000 miles and almost 2 decades, as required by the statute, **PRIOR** to unlawfully restraining Phyllis's Homestead proceeds. However, with great prejudice to Phyllis the Court unlawfully granted the SEC's turnover and restraining application totally ignoring Florida's controlling Constitution, Homestead Statute, and well-litigated common law prohibitions against this restraint, especially because the SEC failed to plead any of the exceptions to Homestead.

42. The Court, the SEC and Eisemann were provided with Florida attorney David Anderson's legal opinion that confirmed Phyllis's motion to deny the payment, *Demayo vs. Chames, So. 2d, 207 WL 4440212 (Fla)* citation which forbids the payment of Legal fees from Homestead proceeds which protects against creditor and predators from depleting

23

Homestead proceeds, but the Court just ignored Phyllis's objections.  The Court unlawfully ordered a "payment" to Eisemann of $56,428 anyway, presumably to get him out of the way so he would not interfere. **(EXHIBIT D-1)**  *Sunbank Miami V. Papadopolous, 740 So. 2d 594 (Fla. 3d DCA 1999), In Re Edwards 456 B.SR. 807 (Bankr. M.D. Fla. 2006), Staten Island Savings bank v. Rich Associates Inc. 6 Fla. L. Weekly Supp. (17th Judicial Circuit 1999), In re: Lee, 223 B.R. 595 (Bankr.M.D. Fla. 1998), Florida Constitution 2004 Art. X, Sec. 4(a)(1),Carter's Afm'rs v. Carter, 20 Florida. 558 (1994, Sherbill v. Miller Mfg. co. 89 So 2d 28, 31 (Fla. 1956), DeMayo v. Chames, So. 2d, 207 WL 4440212 (Fla)., McKean V. Warburton, 919 So. 2d 341, 334 (Fla. 2005), Public Health Trust v. Lopez, 531 So. 2d 946, 948 (Fla 1988), Snyder, 699 So. 2d at 1002, Tramel v. Steward 697 So. 2d 821 (Fla 1997), Rossano v. Britesmile, Inc. 3rd DCA (12.28.2008), Beal Bank SSB v. Almand Associates 780 So. 2d 45 (Fla. 2001), Bowers v Mozingo 399 So. 2d 492 (Fla. 3d DCA 1981).*

43. The results of unlawfully restraining Phyllis's Homestead proceeds resulted in the inhumane targeting of the innocent Gottlieb family with a profoundly disabled child who were about close on the Phyllis's purchase agreement to buy her retirement homestead in Ocala, Florida conditioned solely upon the use of the Aventura Homestead proceeds, but instead the proceeds were unlawfully diverted and restrained resulting in the Gottlieb family being suddenly tossed into the violent consequences of Homelessness and eventual financial ruination without a single credible document to support this heinous action,  The Gottlieb Family was kept homeless for 8+ years, entirely because the Court choose vengeance over the rule of law and refused to make a simple ruling to return Phyllis's Homestead proceeds.

44. Instead of following the controlling Florida Homestead laws the Court took matters into their own hands and willfully held Phyllis and Jesse hostage for 8+ years in an attempt to tighten the screws on Phyllis with each passing day just to extract a ransom from her Homestead proceeds to prevent any further harm to her family.  The Court was informed of the harm to Jesse who had regressed severely due to the confusion of being

24

without a safe harbor home for 8+ years.  These are the same heinous tactics used by <u>Mexican Cartels</u> who demand ransom in exchange for releasing loved ones.

45. On July 12, 2021, Phyllis and Allen filed a 4-part mega motion containing 183 pages and over 250 pages of exhibits to dismiss the action for lack of jurisdiction, failure to meet the requirements of 5222(b), pointing an accusing finger at Eisemann's failure to represent us and asked for damages as a result of this action moving forward with a single credible document, with respect to restraining Phyllis's Homestead proceeds while the Court refused to make a simple ruling on its release keeping the Gottlieb family homeless for over **3000 days**.  The SEC has not opposed the motion, nor have they responded to it in almost two years.  According to Fed. R. Civ P. 3.01, Phyllis respectfully requested that the case be dismissed with respect to herself and enclosed a proposed order to that effect.  She explained that the motion is being filed independently of Eisemann.  The reason Phyllis was forced to file the motion, of course, was because Eisemann refused 10 times already to file the motion as "unopposed", leaving Phyllis no choice but to act to protect her rights.  At the time of writing this into the Complaint the Court has not yet responded.  However, the facts remain the facts and the SEC was not required to respond as other litigants would be. **(EXHIBIT D-2)**

46. The 2003 judgment was against Allen, it was not against Phyllis!  The parties were provided with the *Quigley v. Kennedy and Ely Insurance, Inc., 207 So. 2d 431 (Fla 1968)* citation to prove that Homestead property is protected even against a judgement.  The spirit of the Florida Homestead law was intended to prevent being homeless. Therefore, all parties were aware that the Judgment is against Allen, but even if it were against Phyllis under all circumstance in this case the Judgement remained feckless against Homestead proceeds and it would not matter whether Phyllis owned the property solely, as tenant by the entirety, as an alter ego or even if Allen owned the property (which he does not), Allen would be entitled to same full Homestead protection as Phyllis.  Clearly, the SEC with all the resources available to them, especially in Miami, knew or should have known that targeting Homestead proceeds was not an available

remedy, clearly just a ruthless scheme of revenge to harass and cause pain and suffering to Allen, by transferring that hatred to his innocent wife and disabled child.

47. The New York Court lacked jurisdiction over Phyllis, or her over her Homestead proceeds in 2015, because the Federal Statute of Limitations on disgorgement expired around 1996, when it begun to run in case 94-cv-3034 (LAP).  The SEC disingenuously attempted to circumvent the statute and obstruct justice with their fraudulent claims of alter ego and related case theory.

48. The SEC disingenuously claimed that the $350,000+ that Allen disgorged in 1995 in case 94-3034(LAP) was used to buy Phyllis's homestead, which claim is absurd on its facts and lacking any credibility because the money was disgorged in 1995.  Therefore, their claim was baseless because that money could not be used to buy even bubble gum and its spurious claim was intended just to ignore the facts.

49. As will be noted later the SEC uses the same malicious and unscrupulous scheme to attempt to circumvent the 5-year-disgorgement Statute of Limitations and obstruct justice when they attacked Phyllis's house in Nassau, Bahamas because the statute expired over two decades ago, and Allen already disgorged $350,000 in case 94-cv-3034 (LAP) so neither Phyllis nor Allen could be required to disgorge a second time.  The SEC continued to harass the Gottliebs once again failing to provide a single credible document to overcome the documentary evidence in the Bahamian registry since 1997 when Phyllis purchased the home.

50. The SEC tried to trick the court into believing that Phyllis was a party to case 98-cv-2636 (LAP) by unilaterally adding her name as an "interested party" in 2015, to the 1998 cover page just to make it appear as though Phyllis was an original party, to satisfy the requirement for a "related case", but Phyllis was neither a party nor even a witness.

51. Clearly, Phyllis's Homestead case has turned into a nightmare because the New York Court willy-nilly refused to adjudicate Phyllis's case using the controlling Florida Homestead law which amounts to a willful obstruction of justice by refusing to follow the rule of law.  The case should have been dismissed on day one or remanded back to Florida because Florida has both subject matter and personal jurisdiction, it is where the

action occurred and where all documents are located and where ALL witnesses reside, thus making New York subpoena power unenforceable.  For Phyllis to be forced to travel with her family and disabled child up and back to New York and stay at expensive hotels and restaurants would be untenable under these circumstances and unable to defend her case.  Therefore, Phyllis's case must be heard in Florida which would reduce many of those hardships and obstacles that could not be overcome in Florida and would help to level the playing field somewhat.

52. The SEC was granted a favor when Phyllis's case was transferred to New York and then the SEC was granted another favor when the Court granted the SEC's restraining order under New York CPLR  5222(a) <u>BEFORE</u> meeting the critical requirements to restrain Phyllis's Homestead proceeds.  This is too much prejudice and favoritism because Phyllis is being denied equity and due process. The Court was obligated to permit the purchase of Phyllis's Ocala Homestead to close because the SEC would have been no worse off as a garnisher in Ocala than they were in Aventura.

53. In 2015 when Phyllis's Homestead case was pre-approved for transfer to Hon. Judge Preska's Courtroom, the Assignment Committee was concerned about the apparent conflict in interest and assigned Hon Judge Sullivan to preside instead rather than Hon Judge Preska, because of the Committee recognized the long-standing bad history between Allen and Judge Preska and the possibility of a conflict in interest.  However, Hon Judge Sullivan was heavily lobbied and unilaterally transferred the case to Hon Judge Preska, but in the process Phyllis was <u>denied</u> due process notice and opportunity to present her colorable issues and defend her position against the highly prejudicial and dangerous transfer to Hon Judge Preska.  The record is clear, staying In New York is a punishment where the cards are stacked against Phyllis who only asks that the controlling Florida Statute be enforced, but instead the Gottlieb family has endured underserved pain and suffering with the violence of homelessness with a profoundly disabled child and now after 8 years in financial ruination.

54. Case 98-cv-2636 (LAP) was a relitigation of the same critical circumstances as was already litigated, settled, and dismissed with prejudice in the earlier case 94-cv-3034

(LAP) making the 2003 judgment Void on the grounds it was without jurisdiction and was barred by the doctrines of res judicata, double jeopardy, equitable estoppel and/or unclean hands.  The Court prevented Allen from arguing these issues thus Allen was denied due process opportunity to defend on these winning and well-founded meritorious arguments which are now before the Florida Court.

55. Allen was served process in Nassau, Bahamas, where he worked and the Gottlieb family resided, 22 months after the statute of limitations "honestly" expired which expiry was confirmed by the overwhelming evidence in the record proving that Allen was not a "fugitive".

56. Case 98-cv-2636 (LAP) lacked any evidence proving that Allen earned any additional money after the "disgorgement" in after case 94-cv-3034 (LAP) was dismissed and settled with prejudice and therefore he could not be required to disgorge a second time.

57. The only paid witness the SEC produced lacked any credibility, a college professor who never practiced law, never practiced banking or finance, and never ventured outside of his classroom.  The professor uttered the meritless and absurd statement that *Bank Guarantees are unlawful per se ……. and anyone involved with them are criminals. (?)*

58. At the bench trial, Hon Judge Preska did not permit Allen's expert witness to testify.  Mr. Edward Ramos Sousa was an Attorney admitted to practice in two jurisdictions and worked as an attorney for international investment and banking companies.  Mr. Sousa published a scathing affidavit about the SEC's witch hunt in pursuing Allen after reviewing the case against Allen in which Mr. Sousa confirmed that Allen's actions were completely lawful and proper based upon his own personal experience in banking and finance where companies he represented utilized discounted bank instrument and other forms of bank credit instruments which are lawfully traded in the billions of dollars worldwide. **(EXHIBIT E)**

59. To prove Bank Guarantees (MTN's) and or Standby Letters of Credit are lawful and in accordance with SEC Rule 144(a) and thus Allen had not a trace of scienter, he provided a copy of the Board of Governors for the Federal Reserve's own Bulletin "Anatomy of the Medium-Term Note Market" stating the Governors preferred the use of Medium-

Term Notes (Bank Guarantees) over IPO's because they are less costly and quicker.  The Court ignored the highest authority in the Government like it didn't exist. Allen has provided a few of the important points proving MTN's (bank guarantees) are lawful and preferred over IPO's, plus the first and last pages. **(EXHIBIT F)**

60. Allen worked with Bell, Boyd and Lloyd, a prestigious Chicago law firm working for Hartford Insurance Group, U.S. Leasing and Ford Motor Company and provided the firm's 25-page legal opinion with actual samples of two successful trades to the Court proving Bank Guarantees are lawful but the Court disregarded the exculpatory evidence. **(EXHIBIT G)**

61. Allen provided original Bank Santander, Park Avenue Branch, New York Bank commitment to act as an "escrow bank" for $25 Million roll-over standby letters of credit trading which I obtained under the direction and instructions of Agent Michal Stein for the benefit of "Special Agency Program" to benefit the United States Government. Although I was provided with the code word and the personal telephone number of a well-known Utah Senator to confirm his identity and authority, I was impressed with his willing transparency and chose not to go that far and followed his instructions successfully carried out his order.  **(EXHIBIT H)**

62. Please take note that I used the <u>same escrow bank commitment document</u> already approved by Bank Santander's legal department and their Comptroller, Al Perales, when I was retained by my client, a broker named Kenneth Lagonia when working with Mr. Robert Feldman, Esq. exclusively, who served as Mr. Robert Longo's attorney in case 94-cv-3034(LAP) and in case 98-cv-2636 (LAP).

63. The FBI Supervisory Special Agent for the Bahamas and Caribbean, Mr. Gerald Forrester provided an Amicus Curie affidavit to the Court and agreed to testify under oath.  He testified that he knew Allen Gottlieb in the Bahamas from the America Men's Club.  He swore under oath that Gottlieb could have served him in 24 hours instead of the 7 years the SEC pretended to be looking for him.  Agent Forrester's most important confirmation that proved the SEC's allegations of Gottlieb being a fugitive was without merit when he conspicuously noted that the SEC never asked the FBI for help using the

normal FBI location services.  Also, Allen lived in the United States and was available until late 1997, early 1998 before moving to the Bahamas which is beyond the 5-year statute of limitations.  Can the Court imagine how incriminating this affidavit would be if it were the other way around and provided by the SEC! **(EXHIBIT I)**

64. On discovery, a letter written from the SEC to Hon. Judge Preska was revealed stating that the SEC knew Allen's whereabouts in the Bahamas for years but never served him until after the statute of limitation honestly expired by 22 months.  The information was provided to the SEC by the New York Bar Association and provided by Allen when he accepted a position to work in the Bahamas with main offices in Belgium.  These facts defeat the false allegation that Allen was a "fugitive" that was fabricated by the SEC just to obtain unlimited extensions to the statute.  Unfortunately, I cannot locate the letter.

65. On discovery, a contract was disclosed stating that Feldman and Longo were depending entirely upon a New York Attorney Barday and his client "Keigh" to provide bank guarantees for his trading program which confirmed that they never looked to me for anything other than the Escrow Bank commitment, which I provided from the giant American Express bank in Paris, France which was delivered to Feldman and Longo at a table top meeting at the bank and approved by Attorney Feldmann for which I received 1/3 of 1% for my services which amounted to about $350,000.  The bank guarantees never materialized and no one even contacted American Express bank and the commitment expired once and was renewed without further payment for another 15 days but still nothing happened.  To be noted, this event was the basis for suing me and my broker client, Ken Lagonia, in case 94-cv-3034 (LAP) which had about 15 defendant's 13 of which were totally unknown to me.

66. The Court was obliged to dismiss the case 98-cv-2636 (LAP) against Allen when the SEC intentionally <u>tricked</u> the Court by providing a PHONY Belgium translation from a Belgium process server because thereafter the SEC lacked any credibility, but the bench trial continued!

67. In my opinion only revenge can account for all this exculpatory evidence not resonating with Hon. Judge Preska, who I honestly believe sought only revenge for the dispute we

had in case 94-cv-3034 (LAP) about "being GOD in her Courtroom", because nothing else rings true, or makes any sense. Hon Judge Preska is a brilliant judge and I have followed her ruling ever since she made that cruel ruling against me which was without any merit, without any underpinnings and against the overwhelming weight of evidence in the records proving that Allen did nothing wrong. I wrote a personal letter to then Hon. Judge Preska begging her to review all the evidence. **(EXHIBIT K)**

68. Three SEC thugs approached my New York attorney, Ronald Hariri, Esq. and frightened him with the loss of his law license if he continued to act as my attorney. He was forced to resign in tears just a short time before the bench trial was scheduled. This alone exposes the true nature of the beast my family has been trying to expose since 1998!

69. Allen retained a Florida attorney for the trial at the last minute, Sheldon Zipkin, Esq. Just a day before bench trial my son got very ill and the doctor was considering admitting him to the hospital and Phyllis was also running a high fever which left me to care for our four-year-old daughter, Rachel. I called Zipkin to ask him to call off the trial as I could not leave the family under these circumstances. He explained to me he would explain to the judge the medical emergency. Zipkin told me in very strong words that it would not be necessary for me to travel because under these circumstances as there is nothing in the documents to indicate any wrongdoing, no ill-gotten gains and all the money that I earned was returned in 1995 with a final settlement and dismissal with prejudice.

70. I was told by Zipkin that just prior to requesting that the case against Allen be dismissed the Judge announced that I waived my rights to defend on matters of jurisdiction and the statute of limitations even though this was in the highlighted throughout the pleadings and formed the basis for my defense. Of course, Zipkin renewed all his objections on the record.

71. on January 21, 2003, Hon Judge Preska ruled that me and my client, Kenneth Lagonia are responsible for Civil Penalties "tiered" pursuant *to Section 20(d) of the Securities Act of 1933, 15 U.S.C. sect. 77t(d)* based upon "gross amount of pecuniary gains" in the amount of $877,333! However, this ruling was erroneous because I gained Zero money

because everything was returned in 1995, 94-cv-3034 (LA) without a finding of ill-gotten gains and the record was void of any new monies earned and without an explanation or calculations which was an unparalleled miscarriage of justice. **(EXHIBIT K-1)**

72. Even more confusing and prejudicially unclear being without a calculation the ruling asserted that "the disgorgement amount should be $956,923.92" with interest and another $500,000 from Myers and Schwartz, who were people who claimed they never met me, never communicated with me, never retained me and never sent me money and I never knew who they were in my life, for a grand total nearing $3,000,000.

73. Zipkin, a seasoned trial defense lawyer was completely frustrated and said it was some type of pre-determined back door deal and set-up because the statutes provide for disgorgement of ill-gotten gains and there were none and that I returned the legal fees I earned in 1995. The statute does not give the authority to fabricate calculations based entirely upon *what the persons expected to earn if they succeeded.*

74. To make the order even stranger, at the bench trial Lagonia admitted to stealing Allen's law office computers and law office files as such his testimony lacked any credibility after admitting to being a thief. Despite the Court being fully aware that Lagonia stole my law office computers and files, and who knows what he did with them, Hon Judge Preska ruled that she *depended upon Lagonia's credibility 3-times in her ruling* and then released Lagonia from any financial responsibility leaving me responsible for paying almost $3 Million dollars.

75. Shortly thereafter, Lagonia was convicted of a multi-million-dollar fraud in New Jersey conducted by the **SEC,** called affordable homes. My attorney suspects that a deal was made sweeter for Lagonia who only served about 4 years in prison. In that case Lagonia admitted helping shred incriminating documents to conceal the fraud. Lagonia acknowledged that he signed false employment verifications for nominee purchasers which were submitted to lenders, and notarized deeds and other mortgage documents, falsely representing that the nominee purchasers were present at closings when, in fact, they were not present. So much for Lagonia's credibility!

76. In the years that followed I never gave up trying to prove my innocence. I filed 3-Rule 60 motions loaded with exculpatory evidence, (a) 25 bank documents offering discounted bank guarantees for sale sent to my name as attorney for my clients, (b) provided the original Bank Santander Commitment that was used for Feldman and Longo in case 98-cv-2636 (LAP) and (c) provided a copy of the bulletin from the Board of Governors of the Federal Reserve that they fully agreed with me that MTN's (bank guarantees) are lawful and even preferred over IPO's.  It was very disappointing when they were all summarily dismissed without a hearing. The court filed an injunction against me preventing me from exposing any further information and preventing me from defending myself.  I filed an Appeal with a good outcome.  *15-893 CV (2D Cir. February 11, 2012.* **(EXHIBIT K-2)**

77. I was strictly a civil rights-labor relations lawyer with zero litigation experience and without financial resources, so I was compelled to act pro se and apparently not a good match for the unlimited resources of the SEC.  However, my only consolation is the fact that in all the related cases and motions, no matter what jurisdiction that I filed the action in, the case was always returned to Hon. Judge Preska who never permitted any other judge to opine on any of her rulings.   Finally, my family is appearing before a Florida Court where a righteous decision on the controlling law can finally be made which will end this madness and permit my family to begin the healing process.

78. The SEC instituted an action against me at the New York Grievance Committee based upon case 98-cv-2636 (LAP).  I called my former attorney Ron Hariri, Esq. who still had my files for a recommendation and he introduced me to attorney Samuel Abady, Esq. who agreed to represent me at the NYS Bar and Grievance Committee and at the trial.  Hariri turned over my voluminous files, consisting of hundreds of pages to Abady.  Abady met with Ms. Sherry Cohen, lawyer for the Committee told Abady that the SEC visited them and told her to get Gottlieb, he is a "crook."  I flew to New York 3 or 4 times with Abady, and Sherry Cohen and also met with attorney, Ramos Sousa, an international banking and finance attorney who worked in the same office with Abady.  Abady and me have a very confrontational meeting with Cohen at which time Abady

33

told Cohen in words to the effect, *I am cataloging thousands of pages to prove that trading in bank guarantees was lawful and that Mr. Gottlieb always acted properly.*

79. From no where Abady refused to accept my calls until finally, he accepted my call and demanded $250,000! He said that until he gets the money in his account, he will not answer my calls. I demanded back all my files, but he said "NO!", not without the $250,000. I contacted Cohen and brough her up to date and provided her with written authorization to subpoena my files from Abady because they contained all my work and was necessary to continue the matter and needed for the trial. She agreed to get the subpoena out immediately, but instead she filed charges against me for not cooperating with the Committee and then set a date for a hearing! I could not attend the hearing without a single document to defend myself which resulted in the loss of my license to practice law.

80. Notice the pattern, Sam Abady just like my former attorney, Ron Harari was threatened! Then at the bench trial my expert witness attorney Ramos Sousa was prevented from testifying and then Eisemann was compromised with a $56,528 "payment"!

81. I filed charges against Sam Abady with the Grievance Committee and won the case. I called Ms. Mary Kelly, the chairperson, to ask for a rehearing and/or an appeal. She told me that the one-year statute passed and there would be no appeals! I complained that it took the Committee over a year to come to a decision and asked that the statute be tolled under this circumstance since the Committee ruled in my favor. She said, "I'm sorry" and politely hung up the phone. **(EXHIBIT L)**

82. When I filed a civil rights violation complaint against several agents of the SEC and Hon Judge Preska that case was even sent back to Hon Judge Preska who presided as judge, jury and witness. The complaint was discharged against all parties without discovery and without a single hearing after 3 years. This is another plausible reason for the shared animus toward Allen who was denied due process opportunity and notice to provide his winning and meritorious arguments.

83. In 2019 Phyllis signed an agreement to sell her Bahamian Home for $960,000. Just a few weeks prior to the closing the buyer contacted Phyllis and me and complained that he

loved the house but sadly had to cancel the contract because the SEC wanted him to be a Rat and help them steal Phyllis's proceeds at closing, but he refused to participate in their plot! As I recall, the agreement was signed and a date for closing set in less than 30 days. **(EXHIBIT M)**

84. This is the same fraudulent routine pattern of devious tactics and deception the SEC utilized once before now duplicated as part of their nefarious scheme to obstruct justice and avoid the Statute of Limitations which expired about two decades ago. This obvious harassment without a single credible document was the same tactics the SEC used to restrain Phyllis's Homestead proceeds by fraudulent and malicious claims that Allen was the owner and Phyllis was his alter ego. The SEC ignored the fact that Allen "disgorged" all his lawfully earned legal fees in 1995 without a finding of ill-gotten gains in case 94-cv-3034 (LAP) with the court ruling the case was settled and dismissed with Prejudice. Therefore, that ruling barred any claims to disgorge a second time, for me in 98-cv-2636 (LAP) and a third time from Phyllis, because all money was already disgorged leaving zero two decades ago.

85. The SEC once again maliciously and fraudulently claimed to the buyer that Allen is the actual owner of Phyllis's Bahamian home, and that Phyllis is Allen's alter ego which is clearly just a fraudulent attempt to avoid statute of limitations that expired over two decades ago.

86. Even the Bahamian law and the Hague Convention points to upholding the Country's own laws on real property and rejects all attacks on Real Property after 6 years. The Federal 5-year disgorgement statute of limitations expired over two decades ago! This is an excerpt from the Bahamian statute of limitations. "PART II PERIODS OF LIMITATION FOR DIFFERENT CLASSES OF ACTION 4. The provisions of this Part shall have effect subject to the provisions of Part III which provide for the extension or postponement of the periods of limitation in the case of disability, acknowledgement, part payment, fraud, concealment, and mistake. Actions of Contract and Tort and Certain Other Actions 5. (1) The following actions shall not be brought after the expiry of six years from the date on which the cause of action accrued, that is to say — (a) *actions founded on simple*

35

*contract (including quasi contract) or on tort;* (b) actions to enforce the award of an arbitrator where the submission is not by an instrument under seal; (c) actions to recover any sum recoverable by virtue of any written law; (d) actions to enforce a recognizance. (2) An action upon an instrument under seal shall not be brought after the expiry of twelve years from the date on which the cause of action accrued: Provided that this subsection shall not affect any action for which a shorter period of limitation is prescribed by any other provision of this Act. (3) *An action shall not be brought upon any judgment after the expiry of six years from the date on which the judgment became enforceable, and no arrears of interest in respect of any judgment debt shall be recovered after the expiry of six years from the date on which the interest became due."*

87. The SEC had access to the Bahamian Registry which verifies that Phyllis bought her Bahamian home in 1997, which is 6 years before the 2003 judgment against Allen, which is certainly not against Phyllis.  The SEC has accumulated copies of all the registered documents, including copies of the buyer and seller agreements, all of which clearly prove that Allen has no interest in the Bahamian property and that Phyllis is the sole owner and always has been the sole owner since 1997.  The SEC reaches far beyond the legitimate powers of the  agency credentials into the dark side, plotting to cause damages that reach those of criminality, <u>clearly ultra vires</u>, moving in the shadows just to inflict pain and suffering by fraudulently and maliciously <u>slandering Phyllis's title and tortuously interfering with Phyllis's right to enter into a contract</u> to sell her own Bahamian property for $960,000,  which purchase agreement was cancelled as a result of the SEC's deliberate scheme to lull Phyllis into selling her home just to unlawfully snatch her proceeds once again and frustrate justice and equity, furthering causing damages to the Gottlieb family already in dire distress without a single credible document.  Slander of Title has been established where defendant has (1) communicated to a third person; (2) untrue statements; (3) which disparage the plaintiff's title; and (4) cause him actual or special damage. *Cont'l Dev. Corp. v. Duval Title & Abstract Co., 356 So. 2d 925, 927 (Fla. 2d DCA 1978) (citing Gates v. Utsey, 177 So.2d 486 (Fla. 1st DCA 1965); 50 Am.Jur.2d Libel and Slander Sections 541 and 546*

*(1970))*. Malice can be presumed to exist where Plaintiff established a prima facie case. *Sailboat Key, Inc. v. Gardner, 378 So. 2d 47, 48 (Fla. 3d DCA 1979).* Like claims of libel or slander, a claim of "slander of title" requires a plaintiff to prove, inter alia, that the "defendant published the alleged defamatory statement to a third party." *Bothmann v. Harrington*, 458 So. 2d 1163, 1168,1170 (Fla. 3d DCA 1984). "Slander of title arises upon the malicious publication of a falsehood concerning title which impairs the vendibility of the property." *Miceli v. Gilmac Developers, Inc.*, 467 So. 2d 404, 406 (Fla. 2d DCA 1985). A Plaintiff must prove that Defendants "knew or reasonably should have known *at the time of publication* that the [allegedly false] publication would likely result in inducing others not to deal with the plaintiff." *Phillips v. Epic Aviation, LLC*, 234 F. Supp. 3d 1174, 1211 (M.D. Fla. 2017).

88. The four elements to prove tortious interference with contract exist in Phyllis's case (1) the existence of a business relationship under which plaintiff has legal rights, not necessarily evidenced by an enforceable contract; (2) proof of defendant's knowledge; (3) intentional and unjustified interference with relationship by defendant; and (4) damage to plaintiff as a result of interference. *Nautica Int'l. v. Intermarine USA, L.P.,* 5 F. Supp. 2d 1333, 1344 (S.D.Fla. 1998); *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,* 742 So. 2d 381, 385 (Fla. 4th DCA 1999).

89. All the elements of Tortious interference with contract and business relationship exists in this Phyllis's case,  1) the existence or prospect of a contract, 2) an intentional and willful act interfering with the contract that was calculated to cause damage to the plaintiff, and 3) damages." *Kiepfer v. Beller,* 944 F.2d *1213, 1220 (5th Cir.1991).* There is also a cause of action for tortious interference with prospective business relations, the requisite elements of which are: "1) a reasonable probability that the plaintiff would have gotten a contract, 2) malicious and intentional action by the defendant which aborted the prospective business relationship, and 3) actual harm to the plaintiff." *In re Burzynski, 989 F.2d 733, 739 (5th Cir.1993).* Finally, a plaintiff claiming tortious interference with a contract must prove: "(1) that a contract subject to interference existed, (2) the defendant's act of interference was willful and intentional, (3) the

defendant's intentional act was a proximate cause of the plaintiffs' damage, and (4) actual damage or loss occurred." *Personal Preference Video, Inc. v. Home Box Office, Inc., 986 F.2d 110, 111 (5th Cir.1993) (citing Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 939 (Tex.1991).*

90. The exculpatory documents in the SEC's possession support Phyllis ownership, yet the SEC deliberately proceeded to scheme by knowingly uttering a malicious and fraudulent deception when the SEC told the buyer that Allen is the owner of Phyllis's home.  This 5-star-Pinnochio claim is a mockery of real estate laws and was based entirely on the fact that Allen helped repair his wife's home which the entire Gottlieb family vacationed in and enjoyed for over two decades.  The SEC forgot to add additional evidence to their proof of ownership that Allen also took out the garbage and mowed the lawn.  Real Property Law #101 teaches that ownership of real property is determined by documentation properly filed by licensed attorneys and notarized, which exclude writings on napkins!

91. The SEC have exceeded their lawful authority and abused their powers proving that certain agents are dangerous representatives of the Federal Government and are willing to abuse their SEC credentials, <u>moving ultra vires,</u> causing obstruction of justice, circumventing the rule of law, withholding vital information, misleading the Court, willfully engaging in the dissemination of knowingly false and defamatory information and intentionally trampling upon a citizen's due process rights guaranteed by the United States Constitution which preference end where citizen's rights begin.

92. Our family desperately requires the Florida Court to prevent any further atrocities to my innocent wife and disabled child.  We desperately need to begin our recovery in a safe harbor home and end the devastating homelessness we have suffered with during the last 8+ years, 3000 days especially at 82 years of age and Phyllis 73 taking care of our son and now we must start all over again to protect our family after being financially ruined for no lawful reason just for revenge!

93. The SEC failed to provide a single credible document to support their fraudulent claim that Allen owns Phyllis's Bahamian home, while being in possession of exculpatory

documents proving Phyllis purchased the home in 1997. Despite all this evidence the SEC proceeded with extreme malice aforethought and far beyond their authority, performing deeds under color of law which only criminals scheme to achieve when they enlisted the buyer to participate in ultra vires plot to deceitfully LULL Phyllis into completing the sale so that the SEC could steal Phyllis's sale proceeds at closing.

94. In 2021, the Court was predetermined to find Allen in Contempt and plainly setting him up when they demanded that Allen pays $110,000 (?)! This is contrary to the evidence in the record accumulated since 2003 that proved that in 1994 after Allen's prognosis that his next heart attack would be his last day on earth when he subsequently divested himself of all worldly belongings.  Allen's quit claimed his jointly held interest as a tenant by the entirety in two properties to his wife making her the sole owner.  Thereafter, there was no reason for Allen to accumulate any wealth.

95. Ever since Allen and Phyllis were married almost 50 years ago, his job was always to pay the bills which he continued to act as the family bookkeeper filing out all the checks but then presenting them together with the bills to Phyllis for her signature.  The SEC has all Allen's financial information falsely points at Phyllis checking account after she had a heart attack and could no longer go to the bank when my name was added to her account.  The SEC disingenuously declares that the money was mine!  I already testified about this incident and provided names of friends and family who lent us money while we were waiting for the Court to release Phyllis' Homestead proceeds any day.  The money in Phyllis's account was transferred from Phyllis's and Jesse's account to the Bahamas so that it could be used daily as needed and was never my money.

96. The evidence in the records proves after 1994 that Allen never had more than $500 in his bank account at the end of each month and was often overdrawn.  The claims were unfounded, spurious, and unconscionable but were used by the Court anyway.  The Court permitted attorney-client privileged communications and confidential files into evidence from the law office of Collie and Collie our Bahamian Family attorney who also served as Jesse's guardian all done without our permission.  The Court was obliged to sanction the SEC for introducing attorney-client privileged communications and files into evidence or

reject the tainted information and dismiss the entire hearing, but instead the Court with extreme prejudice to Allen when the Court permitted the tainted evidence into the record without a hearing as to its admissibility. This incident clearly provides a view of the extent to which the New York Court is willing to travel to avoid making a favorable ruling on the evidence and the law.

97. The Gottlieb family including a profoundly disabled child have suffered from the New York Court's cruel and savage punishing treatment without a predicate!

98. The consequences of this savage and brutal targeted attack on my innocent wife and defenseless child is clearly an abomination of justice for over 8 years, 3000 days that has taken its toll on us all causing dire distress and financial ruination due to being forced to suffer this ferocious and unjustified attack by denying us a safe harbor home so that we can begin the healing process.

99. Eisemann has refused to motion for a change of venue to Florida and makes one ridiculous excuse after another, because he no longer represents the Gottlieb family after the Court destroyed our attorney-client relationship when they paid him $56,428 not to interfere. The only reason we have not filed the motion was because the Court disingenuously placed a filing injunction on us which prevented us from exposing these overwhelming frustrations and extreme prejudices.

100.     There was never a lawful reason for Phyllis's Homestead case to leave Florida where the Court has undisputed personal and subject matter jurisdiction and is where the action occurred and the documents are located and where All the witnesses reside and will be subject to subpoena power.

101.     **THERE IS NOW** existing between the parties an actual, justifiable controversy in respect to which Mrs. Phyllis Gottlieb and members of the Gottlieb family are entitled to have a declaration of their rights by a Florida Court pursuant to and based upon the controlling Florida Constitution, Homestead statute and common law rulings.

**WHEREFORE,** Plaintiff's respectfully request:

A. This Honorable Court enter a declaratory judgment declaring the SEC's restraining notice void and of no effect.

B. The Honorable Court enter an order demanding the immediate return of Phyllis's $817,000 Homestead proceeds, including $56,428 unlawfully paid to Eisemann which money came from the sale of Phyllis's Aventura Homestead residence in 2015 to Phyllis Gottlieb or as instructed.

C. The Honorable Court enter an order to prohibit the Defendant from any attempt to hold or garnish the Homestead proceeds and to issue a Permanent Injunction to refrain Defendant from doing any further harm or damage to the Gottlieb family.

D. The Honorable Court to enter an order for compensatory, consequential, special damages plus punitive damages, attorney fees and costs sustained by the Gottlieb family, with a profoundly disabled child, caused by the SEC's willful fraudulent and malicious acts and conduct over 8+years, 3000 days, as the Court deems appropriate under these circumstances.

Respectfully submitted this 8th day of June 2023.

Allen B. Gottlieb, pro se

Phyllis J. Gottlieb, pro se, individually and as Guardian for Jesse H. Gottlieb

9246 Edenshire Circle, Orlando Fla.32836

Lawconsultancy@aol.com, 786-557-3717

**CERTIFICATE OF SERVICE**

Plaintiff, Allen B. Gottlieb hereby certifies that he will hire a process server to serve the Securities and Exchange Commission, Brickell Avenue, Suite 1950, Miami, Florida 33131.

Allen B. Gottlieb    6. 8. 2023

41